# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 23, 2013          Decided April 4, 2014

No. 12-5156

EL PASO NATURAL GAS COMPANY,
APPELLANT

NAVAJO NATION,
APPELLANT

v.

UNITED STATES OF AMERICA, ET AL.,
APPELLEES

———

Consolidated with 12-5157

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:07-cv-00905)

———

*Christopher J. Neumann* argued the cause for appellant El Paso Natural Gas Company. With him on the briefs were *Troy A. Eid* and *Jerry Stouck*.

*Paul E. Frye* argued the cause for appellant Navajo Nation. With him on the briefs was *David A. Taylor*.

*Michael T. Gray*, U.S. Department of Justice, argued the cause and filed the brief for federal appellees.

Before: BROWN, *Circuit Judge*, and EDWARDS and SILBERMAN, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

**TABLE OF CONTENTS**

**INTRODUCTION**

**SUMMARY**

*RCRA Claims Relating to the Dump*

*The District Court's Dismissal of Appellants' RCRA Claims as to the Dump "With Prejudice"*

*RCRA Claims Relating to the Highway 160 Site*

*The Government's Contingent RCRA Counterclaim*

*The Tribe's Mill Tailings Act Claims*

*The Tribe's Remaining Statutory Claims*

*The Tribe's Breach of Trust Claim*

**I.    BACKGROUND**

A.    *The Mill*

B.    *The Highway 160 Site*

C.    *The Dump*

**II.    ANALYSIS**

A.    *RCRA Claims as to the Dump*

　　1.    **CERCLA § 104 Authority**

　　2.    *Frey*'s **"Objective Indicator" Limitation**

　　3.    **Temporal Limitation to "Challenges"**

　　4.    **When a Claim Qualifies as a "Challenge"**

**5.** **The District Court's Dismissal "With Prejudice"**

**B.** *RCRA Claims as to the Highway 160 Site*

**C.** *The Government's Contingent RCRA Counterclaim*

**D.** *Mill Tailings Act*

**E.** *The Indian Dump Cleanup Act and the Indian Agricultural Act*

    **1.** **Private Right of Action**

    **2.** **APA**

**F.** *Breach of Trust*

    **1.** **Governing Principles**

        **a.** **Trust Claims under the Indian Tucker Act**

        **b.** **Circuit Precedent**

    **2.** **The Tribe's Arguments**

        **a.** **25 U.S.C. § 640d-9(a)**

        **b.** **The Indian Dump Cleanup Act, the Indian Agricultural Act, and the Mill Tailings Act**

        **c.** **Other Statutes**

**III. CONCLUSION**

EDWARDS, *Senior Circuit Judge*: This is a weighty case, involving numerous claims concerning environmental hazards at three sites on Navajo land near Tuba City, Arizona. The locations in dispute are (1) the Tuba City Uranium Processing Mill Site ("Mill"), which was the site of a Cold War mining operation that left behind a radioactive byproduct known as mill tailings; (2) the Tuba City Open Dump ("Dump"), a federal waste facility located on both Hopi and Navajo land that was operated by the United States Bureau of Indian Affairs ("BIA") until 1997; and (3) the Highway 160 Dump Site ("Highway 160 Site"), which is situated near the Mill and has also been used as a dump.

The action giving rise to this appeal was initiated in 2007 by Appellant El Paso Natural Gas Company ("El Paso"), the successor-in-interest to the corporation that mined uranium at the Mill. El Paso filed a complaint in District Court against the United States and various federal agencies and officials raising claims under two statutes: the Uranium Mill Tailings Radiation Control Act of 1978 ("Mill Tailings Act"), 42 U.S.C. §§ 7901-7942, and the Solid Waste Disposal Act, which is commonly referred to as the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901-6992k. Appellant Navajo Nation ("Tribe" or "Nation") intervened and asserted parallel claims under the Mill Tailings Act and RCRA, as well as additional claims against the Government.

In 2009, the District Court dismissed El Paso's Mill Tailings Act claim without discovery and certified its ruling for interlocutory appeal. *El Paso Natural Gas Co. v. United States (El Paso I)*, 605 F. Supp. 2d 224 (D.D.C. 2009). This court affirmed the judgment of the District Court. *El Paso Natural Gas Co. v. United States (El Paso II)*, 632 F.3d 1272 (D.C. Cir. 2011).

The District Court then dismissed the balance of Appellants' claims in two memorandum opinions. The trial court first dismissed all of the Tribe's claims, except those arising under RCRA. *El Paso Natural Gas Co. v. United States (El Paso III)*, 774 F. Supp. 2d 40 (D.D.C. 2011). The trial court next dismissed all of Appellants' RCRA claims relating to the Dump for want of jurisdiction due to an administrative settlement between the BIA and the United States Environmental Protection Agency ("EPA") that was formalized three years after the start of litigation. The District Court also dismissed the RCRA claims relating to the Highway 160 Site as moot. *El Paso Natural Gas Co. v.*

*United States (El Paso IV)*, 847 F. Supp. 2d 111 (D.D.C. 2012). An order accompanying the decision denied a motion for discovery and dismissed the RCRA claims regarding the Dump and the Highway 160 Site with prejudice. These consolidated appeals followed.

Given the number of statutes, claims, and locations at issue, we have summarized below the issues on appeal and our holdings with respect to each question before the court.

## SUMMARY

***RCRA Claims Relating to the Dump***. The District Court dismissed these claims after EPA and the BIA entered into administrative settlement in 2010 under § 104 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601-9675. The District Court held that this agreement triggered the jurisdictional bar in CERCLA § 113(h), which forecloses courts from hearing "challenges to removal or remedial action selected under [CERCLA § 104]." *El Paso IV*, 847 F. Supp. 2d at 116-23 (citing 42 U.S.C. § 9613(h)). Challenging this ruling on four fronts, Appellants argue (1) that the Government lacked CERCLA § 104 authority because the waste at the Dump was naturally occurring; (2) that the Administrative Settlement cannot trigger § 113(h) because the settlement lacks an objective indicator of when, if ever, remediation will occur; (3) that their RCRA claims cannot be "challenges" under § 113(h) because they were filed before the CERCLA response action; and (4) that their claims are also not "challenges" because the enforcement of 40 C.F.R. Part 258 landfill regulations will neither delay nor affect the CERCLA response action. In light of Appellants' own pleadings and the clear, if troubling, sweep of § 113(h), we

are obliged to affirm the dismissal of the RCRA claims related to the Dump.

***The District Court's Dismissal of Appellants' RCRA Claims as to the Dump "With Prejudice."*** Appellants argue that, even if their RCRA claims must be dismissed pursuant to CERCLA § 113(h), the dismissal should have been without prejudice. We agree. We therefore reverse the dismissal "with prejudice" of Appellants' RCRA claims that relate to the Dump and remand with instructions to the District Court to enter judgment against Appellants "without prejudice."

***RCRA Claims Relating to the Highway 160 Site***. The District Court dismissed the Tribe's RCRA claim as moot because Congress authorized and appropriated funds for a cleanup at the site in 2009, and because the Tribe assumed responsibility for the cleanup and agreed to a release of liability. *El Paso IV*, 847 F. Supp. 2d at 123-24. It then concluded that El Paso did not have standing to pursue a RCRA claim independent of the Tribe. *Id.* at 124. Appellants argue that the scope of the waiver is much narrower than the District Court thought and does not reach groundwater remediation, which could be the relief obtained under RCRA. We agree with the Tribe that its RCRA claims at the Highway 160 Site are not moot. We therefore vacate the District Court's dismissal of Appellants' RCRA claims as to the Highway 160 Site and remand the case so that these claims can be considered on the merits. Because we conclude that the Tribe's RCRA claims at the Highway 160 Site are not moot, we need not consider whether El Paso has standing.

***The Government's Contingent RCRA Counterclaim***. The Government filed a counterclaim against El Paso under RCRA. The District Court dismissed the counterclaim without prejudice. El Paso argues that the dismissal should have been

with prejudice. We disagree and affirm the judgment of the District Court.

*The Tribe's Mill Tailings Act Claims*. The Tribe brought two claims under the Mill Tailings Act and its associated EPA regulations. *See* 42 U.S.C. §§ 7901-7942; 40 C.F.R. Part 192. The District Court granted the Government's Rule 12(b)(1) motion to dismiss because it thought the Mill Tailings Act precludes judicial review of claims that fall within the scope of the mandatory waiver in § 7915(a)(1). *El Paso III*, 774 F. Supp. 2d at 52. This conclusion was incorrect because the Mill Tailings Act does not preclude review of all claims under the Administrative Procedure Act ("APA"). We nevertheless affirm the dismissal on other grounds. The terms of the waiver executed by the Tribe effectively foreclose its Third Claim for Relief. And the Tribe's Fourth Claim for Relief fails to state a cause of action under the APA.

*The Tribe's Remaining Statutory Claims*. The Tribe also sued under the American Indian Agricultural Resource Management Act ("Indian Agricultural Act"), 25 U.S.C. §§ 3701-3746, and the Indian Lands Open Dump Cleanup Act of 1994 ("Indian Dump Cleanup Act"), 25 U.S.C. §§ 3901-3908. We analyze these claims together because they present the same questions on appeal: namely, whether the statutes create private rights of action, and, if not, whether the Nation has adequately alleged an APA claim based on the Government's failure to act. With respect to the Indian Agricultural Act, the Tribe conceded in its reply brief that the Act contains no private right to sue; we also find that the Tribe failed to plead a claim that is cognizable under the APA. We reach the same conclusions with respect to the Nation's claim under the Indian Dump Cleanup Act. The statute creates agency obligations, but it does not focus on the rights of protected parties. Therefore, no right of action can be

implied in the Act. And the Tribe's claim raises no viable action under the APA because it does not allege that the Government failed to act with respect to some discrete duty that was legally required.

***The Tribe's Breach of Trust Claim***. The Tribe cites several statutes in support of its claim that the Government breached fiduciary duties owed to the Nation. In particular, the Tribe relies on 25 U.S.C. § 640d-9(a), which provides that designated lands "shall be held in trust by the United States exclusively for the Navajo Tribe and as part of the Navajo Reservation." The Tribe argues that this statute, in tandem with the Government's actual control of the trust corpus (*i.e.*, the land at the Mill, Dump, and Highway 160 Site), creates a trust relationship and a concomitant cause of action for breach of trust. We disagree. Indeed, the Supreme Court, in a decision not cited by the parties, rejected the very argument now pressed by the Tribe. We also conclude that the Tribe's argument is contrary to the principles articulated by the Supreme Court in Indian Tucker Act cases. Moreover, we are unconvinced by the Tribe's remaining argument that other statutes – including many of the ones that form the basis for its other claims – establish a viable action here for breach of trust. Therefore, we hold that none of the cited statutes creates a cause of action for breach of trust.

## I.   BACKGROUND

The three locations that are the subject of this suit are located on or near the border between the Hopi and Navajo reservations, near Tuba City, Arizona.

## A.  *The Mill*

From 1956 to 1966, Rare Metals Corporation, the predecessor-in-interest to Appellant El Paso, mined approximately 800,000 tons of uranium at the Mill under a contract pursuant to a federal government nuclear weapons program. Uranium mining produces a sandy, radioactive byproduct called "tailings." Until the 1970s, there was little recognition that tailings were hazardous. They were often left at mining sites, thus creating a serious threat to public health.

In 1978, Congress sought to address the tailings problem by enacting the Mill Tailings Act. 42 U.S.C. § 7901(b)(2). The Act provides for a program to assess and remediate inactive mills sites. It establishes the United States Department of Energy ("DOE") as the administering agency and requires it to designate inactive uranium mill sites for remediation "at or near" twenty locations enumerated in § 7912(a), including Tuba City, Arizona. Consistent with these provisions, the Mill was designated as a "processing site" to be remediated. The Act further directs EPA to promulgate standards to govern the cleanups at the designated tailings sites, *id.* § 7918, which EPA did a few years later, *see* 40 C.F.R. Part 192.

In 1985, before any remedial action at the Mill began, the DOE entered into a cooperative agreement with the Navajo and Hopi Tribes, on whose land the Mill sits. A cooperative agreement is a compulsory component of the Mill Tailings Act, which directs that the "Secretary shall, to the greatest extent practicable, enter into such agreements." 42 U.S.C. § 7915(a). The Act requires that cooperative agreements contain liability waivers, *id.* § 7915(a)(1), pursuant to which the Navajo and Hopi Tribes consented in 1985 to release the United States of "any liability or claim . . . arising out of the

performance of any remedial action on such millsite, vicinity property or depository site." Coop. Agreement Between the United States Dep't of Energy, the Navajo Tribe of Indians & the Hopi Tribe of Indians ("Coop. Agreement") at 17-18, *reprinted in* Joint Appendix ("J.A.") 214-15.

A remedial action plan was then formulated. *See* App'x B to Coop. Agreement, *reprinted in* J.A. 237-70. The plan, which was agreed to by the Navajo and Hopi, included a stabilization-in-place strategy, whereby 1.4 million cubic yards of tailings were collected in a pile and then covered in a disposal cell onsite. The cover of the cell comprised a "radon barrier" consisting of compacted sand, topped by a layer of bedding, and then a layer of rock (riprap, to be precise) designed to protect the radon barrier from erosion. *Id.* at 43, *reprinted in* J.A. 262. The surface cleanup began in 1988 and was completed by 1990. A disposal cell spanning fifty acres now stands on the site. In addition, since 2002 DOE has actively treated contaminated groundwater by pumping it from the aquifer, treating it, and then returning it to the aquifer.

The Tribe now alleges that this remediation is ineffective. According to its allegations, the disposal cell allows rain water to flow directly through the aggregated tailings. This is so because the tailings cover, which consists of sand and small rocks, is permeable. And because the tailings sit atop a thin geologic layer, the contaminated rainwater drains through the tailings straight into the Navajo aquifer, a source of drinking water for nearby residents. There is a suggestion in the record that covers like the one purporting to shield the tailings at the Mill are "100 to 1000 times" more permeable than design targets. The Tribe contends that, in light of this situation, the Mill does not meet the regulatory requirement that it be effective for at least 200 years.

**B.** *The Highway 160 Site*

The Highway 160 Site (so-called because it abuts the eponymous highway) lies just to the north of the Mill. The site comprises sixteen acres of Navajo land. Given its proximity to the Mill, it is probably unsurprising that the Highway 160 Site is also contaminated by radioactive debris.

The Navajo Nation Environmental Protection Agency ("Navajo EPA") discovered the contamination in 2003. Follow-up surveys and investigations in 2006 and 2007 linked the onsite radioactive waste to the Mill and revealed that the site had debris buried below ground. All told, there were sixteen distinct areas of disturbance in need of soil remediation. In addition, there were drums and containers of solid and hazardous wastes that had been left on the ground. In 2007, in view of the dumping at the site, El Paso brought its RCRA citizen claim, as did the Nation in 2010 in its intervenor complaint.

Meanwhile, in 2009, the discoveries at the Highway 160 Site led Congress to authorize and fund a cleanup. Congress included in the Energy and Water Development and Related Agencies Appropriations Act of 2009, Pub. L. No. 111-8, Div. C, 123 Stat. 524, 601-30, a $5 million appropriation to the DOE to perform "remedial actions . . . at real property in the vicinity of the [Mill]." 123 Stat. at 617-18; *see also* 42 U.S.C. § 7922. The language of the appropriation makes clear that Congress intended the remediation to be done under the framework of the Mill Tailings Act.

In 2010 and 2011, the Tribe and the DOE adopted two amendments to a prior cooperative agreement (different than the one governing at the Mill). Amendment 021, *reprinted in*

J.A. 325-29; Amendment 026, *reprinted in* J.A. 420-35. Most of the $5 million in appropriated funds was given to the Navajo EPA to remediate the Highway 160 Site. And in Amendment 026, the Nation agreed to the following waiver:

> Pursuant to 42 U.S.C. 7915, as this amendment involves remedial action, the Navajo Nation (A) releases the United States of any liability or claim thereof by such tribe or person concerning such remedial action, and (B) holds the United States harmless against any claim arising out of the performance of any such remedial action.

Amendment 026 at 2, *reprinted in* J.A. 421.

The remediation selected was to excavate the contaminated material and transport it offsite. This work had commenced in July 2011, although the Navajo EPA was unsure whether the funding would be sufficient to complete the task and had not determined if the groundwater underneath the site was contaminated. *See* Decl. of Cassandra Bloedel ¶¶ 3-5, *reprinted* J.A. 436-37.

In 2011, the Government moved to dismiss as moot the Nation's RCRA based on the congressional appropriation, the liability waiver, and the then-ongoing remedial work. The motion also asserted that El Paso lacked standing to bring a RCRA claim on its own at the site. The District Court agreed and dismissed the claims. *El Paso IV*, 847 F. Supp. 2d at 123-24.

## C. *The Dump*

The allegations concerning the Dump paint a disturbing picture of the Government's inaction in the face of clear

violations of environmental regulations – a picture that only gains texture and detail from a review of the record.

The Dump is a thirty-acre landfill to the southwest of the Mill. It sits mostly on Hopi land, although two acres belong to the Navajo Tribe. It is a federal facility and was operated by the BIA for approximately fifty years without a RCRA permit. Before the BIA ceased operations at the Dump in 1997, trenches were excavated and filled with trash, and then were periodically covered with soil. The site comprises two cells where waste was disposed: the "old cell" is a ten-acre plot that received waste until about 1980, and the "new cell" is a separate twenty acres that received waste thereafter.

During its operation, the Dump received all manner of waste. Locals left their ordinary household trash. The Government disposed of hazardous waste at the site, including medical wastes deposited by the Department of Health and Human Services and the Indian Health Service. And beginning in 1968, the United States discarded residual radioactive materials and waste from the Mill into the Dump.

Unsurprisingly, the Dump site is seriously contaminated. Testing has revealed that the shallow groundwater in the area contains various constituents – including arsenic, selenium, and uranium, to name just a few – that do not meet federal drinking water standards. And wells installed in 2007 to monitor the contamination plume beneath the Dump have confirmed contaminant levels above federally allowable levels.

There is a history of governmental inaction at the Dump. In 1993, prompted by bad conditions such as daily fires at the Dump, local residents served the BIA with a notice of intent to sue for open dumping in violation of RCRA and its landfill

regulations in 40 C.F.R. Part 258. The BIA attempted to close the Dump before the October 9, 1997 regulatory deadline under Part 258, but failed to do so. This was in part due to the discovery of ground water contamination, which meant that the dump no longer qualified for closure as a small exempt landfill under 40 C.F.R. § 258.1(f) and was instead subject to more stringent requirements for closure. In February 2000, EPA issued a notice of potential landfill closure violation but never brought an enforcement action. Meanwhile, the BIA has repeatedly promised to close the Dump but has gotten only as far as conducting preliminary studies – to date, thirty-two of them.

In September 2010 – three years after El Paso initiated this lawsuit – the BIA and EPA entered into an Administrative Settlement Agreement and Order on Consent for Remedial Investigation/Feasibility Study ("Administrative Settlement"), *reprinted in* J.A. 333-88. EPA invoked its authority under CERCLA § 104, delegated from the President, "to act, consistent with the national contingency plan, to remove or arrange for the removal of" a hazardous substance, pollutant, or contaminant that has been released (or threatens to be released) into the environment. 42 U.S.C. § 9604(a)(1). The settlement incorporates into its terms a more detailed plan of action, entitled the Remedial Investigation and Feasibility Study Work Plan ("Workplan"). *See* Workplan, *reprinted in part in* J.A. 391-419, *available in full as attachment to* Pls.' Mem. in Opp'n to Mot. to Dismiss, *El Paso v. United States* (No. 1:07-cv-00905-RJL), ECF No. 73-6.

Under the terms of the Administrative Settlement, the BIA agreed to conduct with EPA oversight a remedial investigation and feasibility study. The purpose of the study is to "determine the nature and extent of contamination and any

threat to the public health, welfare, or the environment," and "to identify and evaluate remedial alternatives to prevent, mitigate or otherwise respond to or remedy any release or threatened release of hazardous substances, pollutants, or contaminants at or from the Site." Admin. Settlement ¶ 9, *reprinted in* J.A. 337-38.

Soon after the settlement was executed, the Government defendants filed a Rule 12(b)(1) motion to dismiss. The motion asserted that, under CERCLA § 113(h), the Settlement Agreement divested the District Court of jurisdiction to hear Appellants' RCRA claims related to the Dump.

## II. ANALYSIS

We review *de novo* the District Court's dismissal of claims for want of subject matter jurisdiction under Rule 12(b)(1) or for failure to state a claim under Rule 12(b)(6). *Kim v. United States*, 632 F.3d 713, 715 (D.C. Cir. 2011). With respect to each claim, we first consider the Rule 12(b)(1) grounds for dismissal, if any, as subject matter jurisdiction presents a threshold question. *Id.* (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998)).

## A. *RCRA Claims as to the Dump*

Congress enacted RCRA in response to the "rising tide in scrap, discarded, and waste materials." *Am. Mining Cong. v. EPA*, 824 F.2d 1177, 1179 (D.C. Cir. 1987) (internal quotations omitted). "Primary in RCRA, Congress empowered the EPA to regulate solid and hazardous waste." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 384 (D.C. Cir. 2012). Citizen suits may be brought against any person, including the United States and any other governmental instrumentality or agency alleged to be in violation of RCRA.

*See* 42 U.S.C. § 6972(a); *see also, e.g.*, *Backcountry Against Dumps v. EPA*, 100 F.3d 147 (D.C. Cir. 1996).

Appellants each brought RCRA citizen-suit claims against the United States and federal agencies relating to the Dump and the Highway 160 Site. El Paso Compl. ¶¶ 94-101, *reprinted in* J.A. 76-78; Navajo Compl. ¶¶ 103-12, *reprinted in* J.A. 114-17; *see also* 42 U.S.C. § 6972(a). The District Court dismissed the RCRA claims with respect to the Dump because, it concluded, CERCLA § 113(h) divested it of jurisdiction.

CERCLA provides for the prompt and efficient cleanup of hazardous substances. *See United States v. City & Cnty. of Denver*, 100 F.3d 1509, 1511 (10th Cir. 1996). EPA has authority under CERCLA to "command government agencies and private parties to clean up hazardous waste sites by or at the expense of the parties responsible for the contamination." *Gen. Elec. Co. v. EPA*, 360 F.3d 188, 189 (D.C. Cir. 2004) (internal quotation marks omitted). In particular, CERCLA § 104 "authorizes EPA, whenever any hazardous substance is released or is threatened to be released into the environment, to undertake two types of response actions: (1) to remove or arrange for the removal of the hazardous substance; and (2) to provide for remedial actions relating to the release or 'substantial threat of release' of the substance." *Id.* (quoting 42 U.S.C. § 9604). CERCLA's definition of "hazardous substance" draws on RCRA's standards. 42 U.S.C. § 9601(14)(C); *see also Meghrig v. KFC W., Inc.*, 516 U.S. 479, 485 (1996).

CERCLA § 113(h) insulates EPA removal and remedial actions taken pursuant to CERCLA § 104 from judicial review. Section 113(h) states in pertinent part that:

No Federal court shall have jurisdiction under Federal law . . . to review *any challenges to removal or remedial action selected under section 9604 of this title . . .* in any action except one of the following [exceptions] . . . .

42 U.S.C. § 9613(h) (emphasis added). The statute then enumerates five exceptions, none of which apply here. As this court has previously stated, § 113(h) "effectuates a blunt withdrawal of federal jurisdiction." *Oil, Chem. & Atomic Workers Int'l Union v. Richardson*, 214 F.3d 1379, 1382 (D.C. Cir. 2000) (internal quotation marks omitted). And indeed it does, so long as its predicates are met.

The District Court determined that the September 2010 Administrative Settlement entered into between EPA and the BIA provided for "removal" actions under CERCLA § 104. *El Paso IV*, 847 F. Supp. 2d at 117. And the District Court reasoned that, because Appellants sought an injunction ordering cleanup activities, the RCRA claims were barred as "challenges" to the removal actions for which CERLCA § 113(h) deprives courts of jurisdiction. *Id.* at 117-18.

Appellants do not contest that EPA and BIA's activities at the Dump constitute "removal" actions, nor could they in view of the statutory definition of the term. The definition of "removal" broadly includes "actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances." 42 U.S.C. § 9601(23). The definition also encompasses "action taken under section 9604(b) of this title," *id.*, and this incorporated subsection includes studies and investigations that EPA "may deem necessary or appropriate" whenever EPA is authorized to act under CERCLA 104(a) *or* whenever EPA "has reason to believe that a release has occurred or is about to occur," *id.* § 9604(b). Moreover "removal" also includes related "enforcement

activities." *Id.* § 9601(25). Thus, the remedial investigation and feasibility study that is a part of the Administrative Settlement falls within the compass of a "removal action" because the agencies have committed to investigate the "nature and extent of contamination" from hazardous substances at the Dump. Admin. Settlement ¶¶ 1, 9; *accord, e.g.*, *Razore v. Tulalip Tribes of Wash.*, 66 F.3d 236, 238-39 (9th Cir. 1995) (concluding that performing such a study is a "removal action").

Notwithstanding the foregoing, Appellants contend that § 113(h) should not bar their RCRA claims in this case. First, Appellants argue the Government has failed to establish that it acted within the scope of its CERCLA § 104 authority, which cannot be invoked to clean up substances that are naturally occurring. Second, Appellants contend the Administrative Settlement and incorporated Workplan cannot serve as the predicate for the application of § 113(h) because the settlement lacks an objective indicator of when remediation will occur. Third, Appellants argue that claims that predate the Government's invocation of CERCLA, like their own, cannot be "challenges" to CERCLA response actions within the meaning of § 113(h). And fourth, the RCRA claims are also not "challenges," in Appellants' view, because enforcing the requirements in Part 258 will not delay or interfere with the CERCLA response action. Br. for Appellant El Paso Natural Gas Co. ("El Paso Br.") at 21-55; *see also* Br. for Appellant Navajo Nation ("Navajo Br.") at 54 n.12 (joining El Paso's arguments).

## 1. CERCLA § 104 Authority

EPA's authority under CERCLA § 104 is limited by subsection (a)(3), which provides in relevant part that the "President [and EPA, by delegation,] shall not provide for a

removal or remedial action under this section in response to a release or threat of release . . . of a naturally occurring substance in its unaltered form, or altered solely through naturally occurring processes or phenomena, from a location where it is naturally found." 42 U.S.C. § 9604(a)(3)(A). Citing this provision, Appellants argue that "the factual record shows that any hazardous substances at the [Dump] most likely are naturally occurring, making CERCLA inapplicable." El Paso Br. at 29; *see also id.* at 25-26 (quoting snippets from the Workplan that, in the aggregate, stand for little more than the straightforward proposition that *some* substances at the Dump are naturally occurring). Appellants further contend that, insofar as a material jurisdictional fact is in dispute – *i.e.*, whether the substances are "naturally occurring" – they are entitled to limited jurisdictional discovery. *Id.* at 30 & n.5 (citing *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36 (D.C. Cir. 2000)).

The chief impediments to Appellants' arguments are their own pleadings. El Paso's complaint repeatedly alleges that non-naturally occurring hazardous substances were released at the Dump. *E.g.*, El Paso Compl. ¶¶ 13, 17, 19-22, 79-87, 92-94, 105, 108, *reprinted in* J.A. 88-116. El Paso would have us ignore its own allegations, but factual allegations in operative pleadings are judicial admissions of fact. *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) ("[T]he allegations in the [operative complaint] are judicial admissions by which [the pleader] was bound throughout the course of the proceeding." (internal quotation marks and alterations omitted)); *Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., Inc.*, 976 F.2d 58, 61 (1st Cir. 1992) ("A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding." (internal quotation marks omitted)). The same

goes for the Tribe, *see, e.g.*, Navajo Compl. ¶ 20, *reprinted in* J.A. 146-47, which has also forfeited this argument by stating in its brief that it "understands that non-naturally occurring contaminants are present in the . . . Dump," Navajo Br. at 54 n.12.

It is of course true that El Paso was entitled to plead in the alternative and, to the extent it did so, to not be bound in one claim by an allegation pled only as to its alternative claim. *See* FED. R. CIV. P. 8(d)(2); *Schott Motorcycle Supply*, 976 F.2d at 61-62 (citing 5 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1282). But that is not what happened. El Paso incorporated *all* of the allegations cited above in its RCRA claim. El Paso Compl. ¶ 103, *reprinted in* J.A. 114. And certain allegations were plainly made in view of the RCRA claim. *Id.* ¶ 13, *reprinted in* J.A. 88-89 (alleging that *RCRA* was violated due to the Government's storage and disposal of, *inter alia*, "medical waste").

Appellants' allegations foreclose their arguing that the substances at the Dump are only "naturally occurring." For the purposes of this proceeding, their pleadings operate as a judicial admission that man-made hazardous waste exists at the Dump, a fact that is fatal to their argument under CERCLA § 104(a)(3). In light of Appellants' admissions, limited jurisdictional discovery was not required. And we do not consider El Paso's argument, raised for the first time in its reply brief, that EPA lacked § 104 authority in light of the definition of "release" in CERCLA § 101(22), which excludes any "release of source, byproduct, or special nuclear material from any processing site designated under" the Mill Tailings Act. El Paso Reply at 10-11 (quoting 42 U.S.C. § 9601(22)).

We have no occasion to address, and we certainly do not endorse, the Government's argument that a suit questioning

EPA's authority to invoke CERCLA is itself a "challenge" barred by CERCLA § 113(h). Br. for the Fed. Defs. ("Gov't Br.") at 38-39. The absolutism of the Government's position is striking. At oral argument, in response to a hypothetical, counsel for the Government stated that the § 113(h) bar would apply *even if* EPA said that it was invoking § 104 as to a site that it *knew* to be contaminated with substances that were exclusively naturally occurring. Later avenues for challenge exist, counsel suggested, such as in a defense to a cost-recovery action or by bringing a CERCLA citizen suit once the response action is completed. When this position is coupled with the Government's additional claim that EPA is not constrained by any time limits on when it must finish ongoing CERCLA actions, the scope of § 113(h) is stretched well beyond what Congress contemplated when the statutory bar was enacted.

In *Frey v. EPA*, 403 F.3d 828 (7th Cir. 2005), the Seventh Circuit raised similar concerns about the Government's construction of § 113(h):

> [W]hat if EPA decides to study the contamination for an indeterminate period of time without taking any remedial action? Counsel had no response when asked whether the statute precludes review if EPA claims that it will take action, after further study, at some point before the sun becomes a red giant and melts the earth. We then asked counsel whether a reviewing court could . . . compel agency action unlawfully withheld or unreasonably delayed, if EPA dragged its feet for decades. Counsel informed us that a court could not act under these circumstances because CERCLA's rules governing judicial review override the APA. . . . We can only conclude from this exchange that EPA considers itself protected from review under CERCLA § 113(h) as long

as it has any notion that it might, some day, take further unspecified action with respect to a particular site.

*Id*. at 834.

The Government's position is dubious, to say the least: *If* EPA's *ipse dixit* is enough to trigger § 113(h), and *if* EPA can also do nothing for as long as it pleases, then CERCLA § 113(h) becomes a license for EPA to do as it will for as long as it would like, all the while free of judicial review. And where federal facilities are involved, this carte blanche has the potential to be used by the Government to avoid liability. We doubt this is what Congress intended in CERCLA § 113(h). In this case, however, having found that Appellants are in fact challenging CERCLA action, it is enough for this court to join the Seventh Circuit in highlighting the problem as one that is ripe for congressional consideration.

### 2. *Frey*'s "Objective Indicator" Limitation

Relying on *Frey*, Appellants next argue that § 113(h) prohibits suits only when the Government provides an "objective indicator that allows for external evaluation, with reasonable target . . . completion dates, of the required work for the site." El Paso Br. at 31 (quoting *Frey*, 403 F.3d at 835). This line of argument is perplexing, both because the issue raised in *Frey* is not the same issue that we face in this case and because the limitation it announces would not apply to the facts before us.

*Frey* addresses the question whether a *CERCLA citizen suit* under 42 U.S.C. § 9659 may proceed under CERCLA § 113(h)(4), which is one of the five enumerated exceptions to the subsection's general ban on challenges to CERCLA actions. 403 F.3d at 829. That case concerned a "remedial

action," not a "removal," a distinction that matters under § 113(h)(4). *Id.* at 835-36. EPA had concluded one phase of its remedial action (excavating polychlorinated biphenyls); however, the agency had not "selected" a remedy for the next phase, which concerned groundwater or sediment contamination. *Id.* at 833. The court rejected EPA's argument that § 113(h) barred CERCLA citizen suits indefinitely while EPA considered its next remedial action. *Id.* at 834. Unlike in *Frey*, there is no doubt that in this case the actions taken pursuant to the Administrative Settlement, including the incorporated Workplan, constitute a "removal" that has been "selected" under § 113(h). In any case, it would be impossible to apply § 113(h)(4), which *Frey* relied upon for this distinction, because Appellants did not bring a CERCLA citizen suit. Appellants' argument thus amounts to a *non sequitur*.

The *Frey* argument also fails on its own terms as the Administrative Settlement in this case would pass the "objective indicator" test articulated in *Frey*. In *Frey*, EPA's CERCLA efforts had come to a standstill, although the agency continued to claim that it would – someday – take remedial action. EPA then attempted to use § 113(h)(4), which blocks citizen suits while "a remedial action is to be undertaken at the site," as a fig leaf to cover its indefinite delay. This situation is not before us; under the terms of the Administrative Settlement, the BIA is required to conduct the remedial investigation and feasibility study under a specific schedule. Admin. Settlement ¶¶ 11(t), 31, *reprinted in* J.A. 343, 349-50. The incorporated Workplan schedule provides specific deadlines for the subtasks involved in finishing the study. Table 5, Conceptual Project Timeline (attached to Workplan), *reprinted in* J.A. 417. To be sure, these deadlines can be modified, *see* Admin. Settlement ¶ 33, and it appears that some *have* been modified. But this possibility does not

render the Administrative Settlement devoid of objective indicators for completion. Indeed, the agreement has benchmarks that would enable a court to determine if the agencies were unduly delaying their removal action and distorting § 113(h) into an "open-ended prohibition on a citizen suit." *Frey*, 403 F.3d at 834.

### 3. Temporal Limitation to "Challenges"

Section 113(h) applies only to "*challenges* to removal or remedial action," 42 U.S.C. § 9613(h) (emphasis added), and Appellants offer two arguments why their RCRA claims are not "challenges." The first is a temporal argument: Appellants contend that the term "challenges" encompasses only suits filed *after* the initiation of a CERCLA response action. (We consider the second argument in Section II.A.4, *infra*.) They reason that the jurisdictional bar in § 113(h) does not apply here because their RCRA claims predate the initiation of the CERCLA removal action. El Paso Br. at 35. In support, Appellants invoke the purported plain meaning of the statute, congressional intent, and the canon that statutory provisions should, if possible, be construed in harmony. *Id.* at 36-46. We are unconvinced.

The meaning of § 113(h), though not plain, supports the Government's position that the § 113(h) bar applies to Appellants' RCRA claims at the Dump. The operative text states that "[n]o Federal court shall have jurisdiction . . . to review *any challenges* to removal or remedial action selected under section 9604 . . . in any action except one of the following" five exceptions. 42 U.S.C. § 9613(h) (emphasis added). Appellants assert that "[o]ne cannot issue a challenge against something that does not exist," and, thus, by construing "Appellants' RCRA claims as a challenge to EPA's later-initiated response action, the [District Court]

disregarded the ordinary meaning of a 'challenge.'" El Paso Br. at 36. The statute, however, refers to "*any* challenges," which favors a broad reading of the term to include challenges that were so when filed *and* later-developing challenges. In other words, so long as Appellants' RCRA claims are live, they are meant to challenge governmental action (or inaction) that is contrary to RCRA, which includes such action taken (or forgone) after Appellants' claims were first advanced to initiate this law suit.

We find no basis in the legislative history to doubt our construction of the text. Appellants cite a House Report that states that the "purpose of this provision is to ensure that there will be no delays associated with a legal challenge of the particular removal or remedial action selected under section 104." H.R. REP. NO. 99-253, pt. 5, at 25-26 (1985). But this reference suffers from the same basic ambiguity as the statutory text, *i.e.*, whether a challenge must be intended as such from the start or whether a claim can become a challenge to a later-filed CERCLA removal or remedial action. If anything, this report underscores the importance to Congress of minimizing litigation-related delays to CERCLA cleanups, and Appellants have offered no persuasive reason why Congress would want to treat differently the two types of litigation-related delays (*i.e.*, delay caused by preexisting claims and delay caused by claims filed after CERCLA response actions). Delay is delay, and both the natural reading of § 113(h) and the apparent purpose of the subsection support our construing "challenges" without regard to the strict chronology of when a particular claim is filed.

Nor are we convinced by Appellants' assertion that the District Court's interpretation of § 113(h) failed to harmonize § 113(h) with RCRA. Our task is to determine what Congress intended when it enacted § 113(h), and we cannot, under the

guise of harmonizing statutes, ignore convincing indicia of congressional intent. Congress drafted § 113(h) just two years after enacting the RCRA citizen suit provision, and yet it did not except RCRA from the sweep of § 113(h). *See River Vill. W. LLC v. Peoples Gas Light & Coke Co.*, 618 F. Supp. 2d 847, 852-53 (N.D. Ill. 2008). And it is clear that Congress knew how to preserve RCRA rights when it so desired. *See* 42 U.S.C. § 9620(i) ("Nothing in this *section* shall affect or impair the obligation of [the Government] to comply with any requirement of [RCRA]." (emphasis added)). But it did not. And like many other circuits, we are satisfied that Congress did not intend to afford RCRA citizen suits special protection from the preemptive sweep of § 113(h). *See, e.g.*, *Cannon v. Gates*, 538 F.3d 1328, 1332-36 (10th Cir. 2008); *OSI, Inc. v. United States*, 525 F.3d 1294, 1297-99 (11th Cir. 2008); *APWU v. Potter*, 343 F.3d 619, 624 (2d Cir. 2003); *Clinton Cnty. Comm'rs v. EPA*, 116 F.3d 1018, 1026-28 (3d Cir. 1997); *McClellan Ecological Seepage Situation v. Perry*, 47 F.3d 325, 328-30 (9th Cir. 1995); *Ark. Peace Ctr. v. Ark. Dep't of Pollution Control & Ecology*, 999 F.2d 1212, 1217-18 (8th Cir. 1993).

### 4. When a Claim Qualifies as a "Challenge"

Appellants also suggest that their claims are not "challenges" under § 113(h) because requiring the BIA to comply with RCRA's Part 258 landfill regulations at the Dump will not delay or affect any CERCLA cleanup at the site. El Paso Br. at 47. In other words, Appellants aim to answer this important question: Under what circumstances does a claim qualify as a "challenge" under § 113(h)?

Other circuits that have addressed this question have applied a "broad standard for what constitutes a challenge." *Cannon*, 538 F.3d at 1336. These courts have found that

lawsuits qualify as "challenges" under § 113(h) when they would create "the kind of interference with the cleanup plan that Congress sought to avoid or delay by the enactment of Section 113(h)." *McClellan*, 47 F.3d at 330; *see also, e.g.*, *Cannon*, 538 F.3d at 1335 ("[A] suit challenges a removal action if it *interferes with* the implementation of a CERCLA remedy because the relief requested *will impact* the removal action selected." (emphasis added) (alteration, internal quotation marks, and citation omitted)); *Broward Gardens Tenants Ass'n v. EPA*, 311 F.3d 1066, 1072 (11th Cir. 2002) ("To determine whether a suit interferes with, and thus challenges, a cleanup, courts look to see if the relief requested *will impact* the remedial action selected." (emphasis added)).

We believe the approach taken by these circuits is consistent with the operative language and purpose of § 113(h). We therefore hold that a claim is a § 113(h) "challenge" if it will *interfere* with a "removal" or a "remedial action." In some situations, the nature and degree of interference are sufficiently direct and clear that it will be obvious that the suit is a "challenge" barred by § 113(h). *See, e.g.*, *Boarhead Corp. v. Erickson*, 923 F.2d 1011, 1012 (3d Cir. 1991) (concluding that § 113(h) barred jurisdiction over a request to stay a CERCLA cleanup until EPA conducted a review of the site as required under the National Historic Preservation Act). In other situations, it may be necessary to assess the nexus between the nature of the suit and the CERCLA cleanup: the more closely related, the clearer it will be that the suit is a "challenge." *See McClellan*, 47 F.3d at 330. As the Ninth Circuit explained,

> every action that increases the cost of a cleanup or diverts resources or personnel from it does not thereby become a "challenge" to the cleanup. The enforcement of minimum wage requirements, for example, might increase the cost

of a cleanup and even divert personnel from cleanup duties without becoming a challenge to the cleanup. [The plaintiff's RCRA] lawsuit, however, *is far more directly related to the goals of the cleanup itself* than is the hypothetical minimum wage action. [The plaintiff], for all practical purposes, seeks to improve on the CERCLA cleanup as embodied in the [agreement].

*Id.* (emphasis added); *see also Gen. Elec.*, 360 F.3d at 194 (concluding that pre-enforcement judicial review of a facial constitutional challenge to CERCLA was permissible under § 113(h), notwithstanding the concern that the challenge, if successful, "would have *the effect* of hindering or delaying EPA's cleanup of hazardous waste sites" (emphasis added)).

Under this framework, there can be little doubt that Appellants' RCRA claims are "challenges." This conclusion is evident from Appellants' pleadings. *See* El Paso Compl. ¶ H, *reprinted in* J.A. 118 (seeking "a permanent injunction ordering that Defendants perform cleanup activities"); Navajo Compl. ¶¶ I.3, I.6, *reprinted in* J.A. 174 (seeking an injunction requiring Defendant to "perform clean-up activities" and to "provide financial and technical assistance to the Navajo Nation to carry out the activities necessary to effect clean closure" of the Dump). The requested relief in this case goes beyond interfering with an ongoing CERCLA removal action. The injunction that Appellants seek would require specific cleanup activities that would threaten to *obviate the very point* of the remedial investigation and feasibility study. As noted above, the point of the study is to analyze the extent of contamination and to evaluate different remedial alternatives so that the Government will be able to choose the "remedial action" that is "appropriate under the circumstances presented" and that will "assure[] protection of human health and the environment." 42 U.S.C. § 9621(d); *see*

*also id.* § 9601(23) (A "removal" includes "actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances.").

Nor does our conclusion change if we assume that Appellants' RCRA claims are limited to enforcing "the ground water monitoring, interim measures, corrective action and other requirements of Part 258." El Paso Br. at 47. These regulations require groundwater sampling, analysis, and, if contaminants are detected above allowable standards, an assessment *and implementation* of a "corrective action" – all on a specified timetable. 40 C.F.R. §§ 258.53(e), 258.53(i) 258.54(c), 258.55(g), 258.57(a)-(b). Claims based on these regulations invariably would interfere with the remedial investigation and feasibility study and, thus, the CERCLA removal. The relief requested by Appellants would alter *how* EPA monitors and assesses the extent of contamination, *see* 42 U.S.C. § 9601(23), and, more importantly, would threaten to preempt EPA's ability to choose the best remedial action among a panoply of remedial alternatives that have been analyzed in a completed remedial investigation and feasibility study according to criteria articulated in CERCLA, not Part 258. *Compare* 40 C.F.R. § 300.430(e)(9)(iii) (listing nine criteria for analyzing remedial alternatives as part of the feasibility study), *with* 40 C.F.R. § 258.57(b) (listing factors for selecting corrective remedies under RCRA's Part 258).

That the RCRA claims are "directly related to the goals of the cleanup itself" bolsters our conclusion that they are "challenges" under § 113(h). *McClellan*, 47 F.3d at 330. One of the four express purposes of the Administrative Settlement is to "ensure compliance with the groundwater monitoring requirements of 40 C.F.R. Part 258." Admin. Settlement ¶ 9(d), *reprinted in* J.A. 338. It is true that CERCLA § 121(d) directs compliance with RCRA standards only with respect to

the "remedial action" selected (not as to a "removal" selected), 42 U.S.C. § 9621(d)(2)(A); however, the Workplan structures the remedial investigation and feasibility study in light of EPA's eventual obligation under the statute. *See* Workplan at 36 ("Section 121(d) of CERCLA requires attainment of federal, state and Tribal [requirements]."); Table 2, "Applicable or Relevant and Appropriate Requirements" (attached to Workplan) at 5 (listing 40 C.F.R. § 258.58 as an applicable requirement and summarizing the requirement as follows: "Municipal landfill groundwater monitoring, provides substantive requirements for groundwater detection monitoring, assessment monitoring, remedy selection and implementation of corrective actions"). In other words, because the remedial action must comply with RCRA, it is reasonable to assume that EPA must conduct its remedial investigation and feasibility study to evaluate remediation which will comply with these obligations. The remedial investigation and feasibility study is thus guided, albeit indirectly, by the very regulations that Appellants seek to enforce judicially.

Appellants cite *United States v. Colorado*, 990 F.2d 1565 (10th Cir. 1993), for the proposition that bringing a RCRA enforcement claim does not constitute a "challenge" under § 113(h). However, *Colorado* is readily distinguishable because that case involved a state's attempt to enforce its hazardous waste requirements. *Id.* at 1576 (citing 42 U.S.C. § 9614(a), providing that "[n]othing in [CERCLA] shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State"); *see also Ark. Peace Ctr.*, 999 F.2d at 1217 (noting that in *Colorado* "the court relied on 42 U.S.C. § 9614(a)" which is not implicated here).

### 5.    The District Court's Dismissal With Prejudice

Finally, Appellants argue that, even if their RCRA claims must be dismissed pursuant to CERCLA § 113(h), the dismissal should have been without prejudice. We agree. Although § 113(h) effects a withdrawal of jurisdiction whenever its predicates are met, the statutory provision – covering only the "Timing of review" – does not permanently withdraw jurisdiction over otherwise viable RCRA claims and claims arising under one of the exceptions to § 113(h).

The Government acknowledges that after a remedial investigation and feasibility study is completed, "EPA could determine that no further remediation work is necessary." Gov't Br. at 47. We can find nothing in the statute that obviously bars a renewed RCRA claim after a removal or remedial action has concluded. The Government simply states, in conclusory terms, that RCRA claims arising after a removal or remedial action has concluded should be barred by CERCLA § 113(h) as impermissible "challenges" to the removal or remedial actions. This seems contrary to the statute because once a removal or remedial action has concluded there would be no "removal" or "remedial action" contemplated by the Government that a renewed suit would "challenge." 42 U.S.C. § 9613(h).

If the Government were to choose not to pursue remedial action, Appellants concededly might elect to bring a claim under CERCLA's citizen suit provision. 42 U.S.C. § 9613(h)(4) (exempting CERCLA citizen suits from the subsection's jurisdictional bar), § 9621(d)(2) (requiring CERCLA remedial action to meet RCRA standards that are "legally applicable"), § 9659(a)(2) (authorizing citizen suits if EPA fails to perform a non-discretionary duty); *see also* Gov't Br. at 35-36. That a cause of action under CERCLA's

citizen suit provision may be available, however, does not mean that this cause of action must be the *exclusive* vehicle for seeking additional remedial action at the Dump.

In any event, we need not decide whether renewed RCRA claims may be brought after a removal or remedial action has concluded. As we have explained, the Appellants' position on this point is far from untenable, but this is a difficult issue that admits of no easy answer. Therefore, we agree that Appellants' current RCRA claims should be dismissed without prejudice because any question regarding the applicability of CERCLA § 113(h) to renewed RCRA claims is unripe for review at this time. We leave resolution of this question for another day. The District Court's dismissal with prejudice is therefore reversed.

## B.  *RCRA Claims as to the Highway 160 Site*

The RCRA claims at the Highway 160 Site remain for our consideration. The District Court ruled that the Nation's RCRA claim was mooted by the congressional appropriation for site remediation and by the Tribe's agreeing to the liability release in Amendment 026. *El Paso IV*, 847 F. Supp. 2d at 123-24. This was error. The congressional appropriation and the agreements between the Nation and the DOE are insufficient to moot the Nation's RCRA claim.

The mootness limitation is constitutional:

Because the exercise of judicial power under Article III depends upon the existence of a case or controversy, a federal court may not render advisory opinions or decide questions that do not affect the rights of parties properly before it. *See North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (per curiam). A court's judgment must resolve "a

real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* This means that an actual controversy must exist at all stages of judicial review, not merely when the complaint is filed. *See Roe v. Wade*, 410 U.S. 113, 125 (1973).

EDWARDS, ELLIOTT & LEVY, FEDERAL STANDARDS OF REVIEW 134 (2d ed. 2013). And a court must "refrain from deciding [a case that was live when filed] if 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'" *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc) (quoting *Transwestern Pipeline Co. v. FERC*, 897 F.2d 570, 575 (D.C. Cir. 1990)).

The congressional appropriation for site remediation certainly did not render the Tribe's claim moot. The appropriation merely offers some support for relief efforts, but it does not guarantee remedial results, nor by its terms does it bar the Tribe's present action. Likewise, the Tribe's execution of the liability release in Amendment 026 did not moot its current claim as to the Highway 160 Site. The release in Amendment 026 does not sweep nearly so broadly as the District Court thought.

The District Court relied on clause (A) of the waiver but omitted key phrasing. In relevant part, the waiver states: "*Pursuant to 42 U.S.C. 7915*, as this amendment involves *remedial action*, the Navajo Nation (A) releases the United States of any liability or claim thereof by such tribe or person *concerning such remedial action . . . .*" Amendment 026 at 2, *reprinted in* J.A. 421 (emphasis added). The first clause refers

to the Mill Tailings Act, and the phrasing of the second clause establishes a link between "remedial action" and the Act. This language makes clear that the Tribe and DOE contemplated in this release a *specific type* of remedial action, namely that taken under the authority of the Mill Tailings Act.

Simply put: the agreement does not contemplate a release of liability "concerning *any* remedial action," it only releases liability "concerning *such remedial action*." And the Tribe's RCRA claim is not one "concerning such remedial action." Among other things, the Tribe seeks to enforce RCRA regulations that require the implementation of a "ground water monitoring" program. Navajo Compl. ¶ 76, *reprinted in* J.A. 162-63. Ground water remediation "concerns such remedial action" only insofar as it *would take place at the same location*, albeit on different strata. As the Tribe explained, the remedial action selected at the Highway 160 Site "only concerns soil," Navajo Br. at 58, which the Government does not dispute in its brief. Indeed, it would make no sense to say that the remediation covered groundwater, as it was unclear at the time whether the groundwater beneath the site was contaminated. *See* Bloedel Decl. ¶ 5.

The bottom line is that the Tribe still has an injury caused by the Government that can be remediated by requiring compliance with RCRA's groundwater compliance regulations. And no events have transpired to moot its claim.

The District Court's additional rationale concerning the broad purpose of the cooperative agreement is unconvincing. It credited the "broad statement of purpose" in Amendment 026 "to complete remediation of the Highway 160 Site." *El Paso IV*, 847 F. Supp. 2d at 123. But this quote is but an isolated statement from a document which otherwise makes

clear that the remedial action would entail excavating the contaminated materials from the soil, and not some all-encompassing remedial action. *See* Attach. A to Amendment 026 at 5, *reprinted in* J.A. 429. More fundamentally, under the District Court's reading, the phrase "concerning such *remedial action*" means the same thing as "concerning the *Highway 160 Site*" or "concerning *any* remedial action *ever*." This is not what the waiver says.

Even if the disputed waiver were ambiguous on the question whether it covers the Tribe's RCRA groundwater claims – which it is not – we would resolve the ambiguity in the Tribe's favor. *See Ramah Navajo Chapter v. Salazar*, 644 F.3d 1054, 1062 (10th Cir. 2011), *aff'd*, 132 S. Ct. 2181 (2012) (agreements dealing with Indian affairs have been construed liberally in favor of establishing Indian rights).

Because we conclude that the Tribe's RCRA claims at the Highway 160 Site are not moot, we need not consider whether El Paso has standing. *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996) ("For each claim, if constitutional and prudential standing can be shown for at least one plaintiff, we need not consider the standing of the other plaintiffs to raise that claim."). We therefore reverse the District Court's dismissal of Appellants' RCRA claims as to the Highway 160 Site and remand the case so that these claims can be considered on the merits.

## C.  *The Government's Contingent RCRA Counterclaim*

The Government filed a counterclaim against El Paso under RCRA pursuant to the citizen endangerment provision, 42 U.S.C. § 6972(a)(1)(B). Am. Countercl., *reprinted in* J.A. 176. Before the District Court, the Government characterized its claim as "a protective reciprocal counterclaim," and

explained that the claim "ensures that there is a vehicle for the Court to equitably apportion cleanup responsibility for the properties among responsible parties, including [El Paso], should [El Paso] succeed on its RCRA claims." United States' Mem. in Opp'n to Mot. to Dismiss Am. Countercl. at 2, 14-15, *El Paso v. United States* (No. 1:07-cv-00905-RJL), ECF No. 59.

El Paso moved to dismiss the counterclaim, and the District Court denied the motion in a minute order. Later, however, in light of the dismissal of Appellants' RCRA claims, the District Court dismissed the Government's counterclaim without prejudice. El Paso argues that the Government's counterclaim should have been dismissed *with prejudice*. Even though El Paso prevailed on the counterclaim, it is within its rights to "appeal a dismissal without prejudice on the grounds that it wants one with prejudice." *See Sea-Land Serv., Inc. v. DOT*, 137 F.3d 640, 647 n.4 (D.C. Cir. 1998) (citation omitted). El Paso provides two grounds why the dismissal should have been with prejudice. First, it contends that the Government is not authorized to bring a RCRA "citizen suit" under 42 U.S.C. § 6972(a)(1)(B). El Paso Br. at 57-61. Second, El Paso argues that the claim is inadequately pled. *Id.* at 61-62.

We start with the language of the statute. Subsection (a)(1) of the citizen suit provision states:

> Except as provided in subsection (b) or (c) of this section, any *person* may commence a civil action on his own behalf . . . (B) against any person, including the United States and any other governmental instrumentality or agency . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous

waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1) (emphasis added). RCRA defines "person" to include not just individuals but also, *inter alia*, "each department, agency, and instrumentality of the United States." *Id.* § 6903(15). The question for us is whether the Government is a "person" who "may commence a civil action." Or, more precisely, whether the *federal defendants* – who, until now, we have referred to as, collectively, the "Government" – are "persons" entitled to bring suit.

The plain import of the operative text of § 6972(a)(1)(B) and § 6903(15) settles the issue. The express definition of "person" includes the counterclaimants. And subsection (a)(1)(B) only confirms this application: the "including" clause in § 6972(a)(1)(B) indicates that "person" as used in the subsection encompasses the United States. *Id.* § 6972(a)(1)(B) ("against any person, *including the United States and any other governmental instrumentality or agency*" (emphasis added)). We read the first use of "person" *in pari materia* with the second mention of the term, which *includes* governmental agencies.

El Paso's arguments are unavailing in the face of this clear statutory command. It contends that allowing governmental entities to bring citizen suits runs contrary to the statutory scheme that separately authorizes EPA to bring suits on behalf of the United States. 42 U.S.C. § 6973(a). This is a fair point, but EPA is not a counterclaimant and nothing in § 6973 expressly limits alternative action taken under the citizen suit provision. Permitting federal agencies to sue under § 6972(a)(1)(B) will not undermine EPA's primary enforcement authority because a citizen suit, including one brought by a federal agency, cannot proceed until 90 days

after EPA is given notice of the endangerment. *Id.* § 6972(b)(2)(A); *see also id.* § 6972(d) (giving EPA right to intervene).

El Paso also cites legislative history to suggest that the amendment in 1992 that added federal agencies to RCRA's definition of "person" was for a limited purpose: to make clear that RCRA waived sovereign immunity for citizen suits against federal facilities. El Paso Br. at 60 (citing H.R. REP. NO. 102-111, at 5-6 (1991)). The inference El Paso would have us draw is that the amendment is therefore not intended for other purposes, such as allowing federal agencies to bring RCRA citizen suits. But the evidence is mixed or, if anything, more supportive of the Government's interpretation. *See* S. REP. NO. 102-67, at 5 (1991) ("[T]he bill amends the definition of person in section 1004(15) of the Solid Waste Disposal Act [*i.e.*, RCRA] so that all of the provisions of that Act apply in the same manner and to the same extent to both Federal and non-Federal persons."). With the statute as clear as it is, El Paso's arguments on appeal are insufficient for us to forgo giving effect to the plain import of the provision. The counterclaim was valid under RCRA.

We are also unconvinced by El Paso's second argument, that the counterclaim is "legally deficient because it contains only conditional allegations that do not actually allege an endangerment." El Paso Br. at 61. El Paso observes that the counterclaim alleges that "[t]o the extent that either [El Paso] or the Navajo Nation establishes, as alleged in their complaints, that solid or hazardous waste [at one of the relevant sites] may present an imminent and substantial endangerment to health or the environment, then [El Paso] is liable under [RCRA] section 7002(a)(1)(B), 42 U.S.C. 6972(a)(1)(B)." *Id.* (quoting Am. Countercl. ¶ 24). In El Paso's view, this is insufficient under Rule 8(a)(2) because

the counterclaim does not show that the Government is entitled to relief.

If El Paso conceded that its own RCRA claim was not plausible, then perhaps it would have a point. But it does not. Its argument is therefore meritless. Counterclaims made contingent on the outcome of the principal action are permissible. *See Springs v. First Nat'l Bank of Cut Bank*, 835 F.2d 1293, 1296 (9th Cir. 1988) ("[A] counterclaim is not barred because recovery will depend on the outcome of the main action."); s*ee also* WRIGHT & MILLER, FED. PRACTICE & PROCEDURE § 1411 ("A counterclaim will not be denied treatment as a compulsory counterclaim solely because recovery on it depends on the outcome of the main action, however. This approach seems sound when the counterclaim is based on pre-action events and only the right to relief depends upon the outcome of the main action.").

We therefore affirm the District Court's dismissal of the Government's counterclaim without prejudice.

**D.** *Mill Tailings Act*

Only claims brought by the Nation remain. Of these, we turn next to the two claims that allege violations at the Mill of the Mill Tailings Act and related regulations. 42 U.S.C. §§ 7901-7942; 40 C.F.R. Part 192. The Third Claim for Relief contends that the DOE failed to comply with EPA regulations requiring the Mill's remediation to "meet certain design criteria and environmental standards," including the requirement that the remediation be designed to "be effective . . . for at least 200 years." Navajo Compl. ¶¶ 90-93 (citing 40 C.F.R. § 192.02(a)). And the Fourth Claim for Relief alleges that the DOE "failed to complete remedial action at the Mill before September 30, 1998," which is the deadline for such

action under the statute. *Id.* ¶¶ 96-98 (citing 42 U.S.C. § 7912(a)(1)); *see also* 42 U.S.C. § 7922(a)(1). It further alleges that DOE failed to "take appropriate action to restore groundwater at and near the Mill." Navajo Compl. ¶ 98.

The Government argues that these claims are barred for want of subject matter jurisdiction because the Mill Tailings Act precludes judicial review. Gov't Br. at 71-75. Alternatively, the Government says the Tribe has failed to state a claim for relief. *Id.* at 73 n.7, 76-77. The District Court agreed that it lacked jurisdiction. *El Paso III*, 774 F. Supp. 2d at 45-47. For the reasons that follow, we conclude that the District Court had jurisdiction but that dismissal was nevertheless appropriate because the two counts fail to state viable claims for relief. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) ("Although the district court erroneously dismissed the action pursuant to Rule 12(b)(1), we could nonetheless affirm the dismissal if dismissal were otherwise proper based on failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).").

We can make quick work of the Government's suggestion that the District Court lacked jurisdiction. The Tribe does not argue that the Mill Tailings Act affords a private right of action; rather, it stakes its claim on a cause of action under the APA. *See* 5 U.S.C. § 702. Furthermore, as the Supreme Court has made clear, a plaintiff's claim under the APA is not barred by another statute if the other statute does not cover the type of grievance the plaintiff seeks to assert under the APA. *Match-E-Be-Nash-She-Wish Band of Pottawatomi v. Patchak*, 132 S. Ct. 2199, 2205 & n.3 (2012).

The APA expressly does not afford a cause of action "to the extent that . . . statutes preclude judicial review." 5 U.S.C.

§ 701(a)(1). And the Government contends that the Mill Tailings Act "precludes judicial review." We disagree. We can find nothing in the Mill Tailings Act that precludes the Tribe's APA claims here. When considering whether a statute bars judicial review, "[w]e begin with the strong presumption that Congress intends judicial review of administrative action." *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986). Overcoming this presumption is no easy task; indeed, "where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." *Id.* at 672 n.3.

The Government argues that the Mill Tailing Act impliedly precluded the District Court from entertaining the Tribe's APA claims because § 7915(a)(1) states that, if the Secretary of Energy enters into a cooperative agreement with a tribe, the tribe "*shall execute a waiver* (A) releasing the United States of any liability or claim thereof by such tribe or person concerning such remedial action and (B) holding the United States harmless against any claim arising out of the performance of any such remedial action." 42 U.S.C. § 7915(a)(1) (emphasis added); Gov't Br. at 72. This argument makes little sense because there is nothing in § 7915(a)(1) to indicate that it bars all APA claims. Section 7915(a)(1) does not by its terms preclude anything; rather, it says that, upon entering into a remedial action agreement under the Mill Tailing Act, the Tribe must sign a waiver agreement that might serve to limit or bar future suits. Section 7915(a)(1) does not categorically bar all claims under the APA, nor does it address the scope of permissible actions under the APA. The scope of any waiver that the Tribe signs will be relevant in determining whether it may pursue an action under the APA, but that is a different matter entirely.

Furthermore, Congress did explicitly bar review as to *some* DOE action under the Mill Tailings Act, 42 U.S.C. § 7912(d). This implies that it did *not* intend judicial review to be foreclosed as to other DOE actions, like those challenged here. The Government's arguments have not removed the "substantial doubt" that Congress meant to foreclose judicial review in these circumstances. *Bowen*, 476 U.S. at 672 n.3. As a result, the presumption of reviewability controls, and the District Court had jurisdiction.

Nonetheless, we agree with the Government that the two counts must be dismissed under Rule 12(b)(6). *See St. Francis Xavier*, 117 F.3d at 624. To begin with, the particular terms of the waiver in the cooperative agreement here control the disposition of the Third Claim for Relief. *See* Coop. Agreement at 17-18, *reprinted in* J.A. 214-15. The waiver releases the United States of "*any liability or claim . . .* arising out of the performance of any remedial action." *Id.* (emphasis added). In the Third Claim for Relief, the Tribe asserts that the Government failed to meet certain design criteria and environmental standards. These are clearly matters arising out of the "performance" of the "remedial action," which is covered by the waiver. *See id.* at 4, *reprinted in* J.A. 200 (defining "remedial action" as "the assessment, *design*, construction, renovation, reclamation, decommissioning, and decontamination activities of DOE" (emphasis added)).

In the Fourth Claim for Relief, the Tribe alleges that the DOE "failed to complete remedial action at the Mill before September 30, 1998." Navajo Compl. ¶ 98. This alleged *failure to act* does not arise out of "performance" under the waiver, so it is not directly covered by the waiver. The claim is nonetheless flawed because it does not assert any discrete duties which the DOE failed to take and which it was obliged to take with respect to remedial action. *Norton v. S. Utah*

*Wilderness Alliance (SUWA)*, 542 U.S. 55, 64 (2004) ("[A] claim under § 706(1) [of the APA] can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."). A plaintiff may not rely on § 706(1) of the APA to advance "broad programmatic attack[s]." *Id.*; *see also* Section II.E, *infra* (amplifying the holding in *SUWA*).

In sum, we conclude that the Mill Tailings Act does not preclude judicial review of the Tribe's claims. But we affirm on alternative grounds. The terms of the waiver executed by the Tribe plainly bars the Third Claim for Relief. And the Fourth Claim for Relief fails to state a claim since it alleges no discrete duty to act incumbent on the DOE.

**E.** *The Indian Dump Cleanup Act and the Indian Agricultural Act*

The Tribe pursued two other statutory claims. Its Second Claim for Relief alleges that § 3712(b) of the Indian Agricultural Act imposes a duty on the Secretary of the Interior to comply with tribal law, and that the Secretary has violated this duty by violating various incorporated tribal laws. Navajo Compl. ¶¶ 84-88, *reprinted in* J.A. 165-66. And its Ninth Claim for Relief alleges that the Indian Health Service "failed and refused to consult with the Navajo Nation" and thereby violated duties imposed by § 3904 of the Indian Dump Cleanup Act. *Id.* ¶ 120, *reprinted in* J.A. 170. Although this claim mentions only the Dump, *id.* ¶ 118, we assume that, broadly construed, it reaches the Highway 160 Site as well.

We evaluate both claims inasmuch as they apply to sites *other than* the Dump (where CERCLA § 113(h) has divested the court of jurisdiction). And like the District Court, we

consider the claims together as they raise issues that fit neatly in the same analytical framework. For both, the real dispute is whether the Tribe has a viable cause of action, which, in turn, depends on two issues: (1) whether the particular statute affords an implied private right of action, and, if not, (2) whether the Tribe has alleged "final agency action" sufficient to invoke APA review.

### 1. Private Right of Action

After contending before the District Court and in its opening brief here that the Indian Agricultural Act creates a private right of action, the Tribe concedes in its reply that it does not. Navajo Reply at 9 n.5 (acknowledging that the statutory language preserving sovereign immunity "is inconsistent with a private right of action and the Nation no longer asserts that [the Indian Agricultural Act] creates one"); *see also* 25 U.S.C. § 3712(d).

The Tribe argues instead that Congress created a right of action in the Indian Dump Cleanup Act. If so, it is implied. *See* 25 U.S.C. §§ 3901-3908 (containing no express right of action). The guiding principle with respect to implied rights of action is legislative intent; the "judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). To determine whether Congress intended to afford a private remedy against the Government, we look to *Cort v. Ash*, 422 U.S. 66, 78 (1975), and "the long line of cases stemming" from that decision. *Tax Analysts v. Comm'r*, 214 F.3d 179, 185 (D.C. Cir. 2000); *see also Sandoval*, 532 U.S. at 287 (reaffirming the vitality of *Cort*, 422 U.S. 66).

The Supreme Court in *Cort* specified four factors to determine whether Congress intended to provide an implied private right of action:

> (1) whether the plaintiff is one of the class for whose benefit the statute was enacted; (2) whether some indication exists of legislative intent, explicit or implicit, either to create or to deny a private remedy; (3) whether implying a private right of action is consistent with the underlying purposes of the legislative scheme; and (4) whether the cause of action is one traditionally relegated to state law, such that it would be inappropriate for the court to infer a cause of action based solely on federal law.

*Tax Analysts*, 214 F.3d at 185-86 (citing *Cort*, 422 U.S. at 78). Applying this test, we conclude that no private right of action can be inferred.

First, private remedies follow *private rights*, and we agree with the District Court that the Act "focuses on the regulating agency's obligations, and not on the rights of the protected party." *El Paso III*, 774 F. Supp. 2d at 49 (citing *Sandoval*, 532 U.S. at 289). We see nothing to indicate that the statute implicitly confers a right of action. *See Godwin v. Sec'y of HUD*, 356 F.3d 310, 312 (D.C. Cir. 2004). As the *Godwin* court explained,

> "In fact, it is difficult to understand why a court would ever hold that Congress, in enacting a statute that creates federal obligations, has implicitly created a private right of action against the federal government, [as] there is hardly ever any need for Congress to do so" given that agency action can normally be reviewed by a district court pursuant to its federal question jurisdiction.

*Id.* (quoting *NAACP v. Sec'y of HUD*, 817 F.2d 149, 152 (1st Cir. 1987) (Breyer, J.) (emphasis omitted)).

We hold below that the Tribe has no viable action under the APA in this case, but that does not change our analysis here. Indeed, if anything, the absence of an APA claim here "only reinforces our view that the [statute] creates no implied right of action, for it would be quite odd to hold that Congress implicitly created a cause of action despite another statute's preclusion of such an action. Given Congress's presumed awareness of the APA's provisions, we believe – in accordance with the holdings of other circuits – that Congress would make explicit any intent to create a cause of action in these circumstances." *Id.* at 312 (citations omitted).

In the absence of clear indicia of intent to the contrary, we hold that the Indian Dump Cleanup Act does not provide an implied right to sue.

### 2. APA

There being no private right of action in either statute, the viability of the Tribe's Second and Ninth Claims for Relief turns on whether the Tribe has adequately pled its claims under the APA. Both claims allege failures to act. *See* 5 U.S.C. § 706(1) ("The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed").

Such failures to act "are sometimes remediable under the APA, but not always." *SUWA*, 542 U.S. at 61. Drawing on the "agency action" language in sections 702, 704 and 706(1) of the APA, the Supreme Court made clear that to bring a "failure to act" claim under § 706(1) of the APA, a plaintiff must sufficiently allege "that an agency failed to take a

*discrete* agency action that it is *required to take*." *SUWA*, 542 U.S. at 64; *see also Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 227 (D.C. Cir. 2009). With these two requirements in hand – that the allegedly withheld action be (1) "legally required" and (2) "discrete" – we turn to the Tribe's claims and allegations.

*First*, with respect to the Indian Agricultural Act claim, the Tribe argues that § 3712(a)-(b) imposes on the Secretary of the Interior a legal obligation to take discrete agency action. This provision states:

> (a) Tribal recognition– The Secretary shall conduct all land management activities on Indian agricultural land . . . in accordance with all tribal laws and ordinances, except in specific instances where such compliance would be contrary to the trust responsibility of the United States.

> (b) Tribal laws– Unless otherwise prohibited by Federal law, the Secretary shall comply with tribal laws and ordinances pertaining to Indian agricultural lands, including laws regulating the environment and historic or cultural preservation, and laws or ordinances adopted by the tribal government to regulate land use or other activities under tribal jurisdiction. The Secretary shall—
> > . . .
> > (3) upon the request of an Indian tribe, require appropriate Federal officials to appear in tribal forums.

25 U.S.C. § 3712(a)-(b). The Nation argues it has stated a viable APA claim because it "alleged that the Secretary was not complying with the permitting requirements of the Navajo Clean Water Act and was violating the Navajo Nation Civil

Trespass Act by failing to remove hazardous wastes from the Open Dump and the Highway 160 Dump Site." Navajo Br. at 28; *see also* Navajo Compl. ¶¶ 85-88.

We think these allegations are insufficient to state a claim for relief. The chief problem with the Tribe's argument is that the language above does not appear to endow the agency with a duty to act; rather, it requires that when the agency does act, its action must comport with tribal law. The portion of § 3712(b) cited by the Tribe ("the Secretary shall comply with tribal laws") contains only a general follow-the-law directive. *Cf.* 25 U.S.C. § 3712(b)(3) (which *does* set forth discrete agency action). This sort of provision flunks *SUWA*'s discreteness test. As the District Court put it, the "statute simply requires that when the agency acts, it act in compliance with tribal law. It does not impose an affirmative duty to act for the purpose of preventing violations of tribal law." *El Paso III*, 774 F. Supp. 2d at 50. Meanwhile, subsection (a) applies only when the Interior Secretary conducts "land management activities," § 3712(a), but the Nation has not alleged that the Interior Secretary's failures to act came in the context of such activities.

Furthermore, insofar as the claim is premised on the Navajo Nation Civil Trespass Act and the Government's failure to remove waste from the Dump or Highway 160 Site, we lack jurisdiction to hear it. Seeking an injunction to remove the hazardous waste from the Dump would plainly constitute a "challenge" under CERCLA § 113(h). And such a request would be moot as to the Highway 160 Site because, unlike with the Tribe's RCRA claim, the remedial project that was implemented there is the very thing that the Tribe says is required under tribal law – removing the waste. *See* Navajo Br. at 28. Nor can we comprehend the Tribe's passing reference to the *BIA's* discharge of pollutants from the Mill.

*Id.* at 45-46. The complaint suggests that the *DOE* – and not the Interior Department – is in charge of the Mill and the remedial project there. *See* Navajo Compl. ¶¶ 23, 25, *reprinted in* J.A. 147-48. And the DOE is free of the duties imposed on the Department of Interior under the Indian Agricultural Act. 25 U.S.C. §§ 3703(15) (defining "Secretary" as the Secretary of the Interior), 3712(a)-(b) (imposing requirements on the "Secretary").

*Second*, an APA claim premised on the Indian Dump Cleanup Act also fails. In particular, the Tribe relies on 25 U.S.C. § 3904. This provision directs the Indian Health Service to "provide financial and technical assistance to the Indian tribal government . . . to carry out the activities necessary to (1) close such dumps; and (2) provide for postclosure maintenance of such dumps." 25 U.S.C. § 3904(b). The Nation argues that the Indian Health Service's failure "to provide the mandated financial and technical assistance" is cognizable under the APA. Navajo Br. at 32.

This claim falters because the purportedly mandatory duty is contingent on a series of predicate acts in subsection (a). That is, the duty to provide assistance in subsection (b) can only be invoked "[u]pon completion of the activities required to be performed pursuant to subsection (a)." 25 U.S.C. § 3904(b). There is no indication that the outlined activities were in fact completed. The District Court so held, *El Paso III*, 774 F. Supp. 2d at 50-51, and the Tribe did not challenge this conclusion in its brief. What is more, the assistance required in subsection (b) is made conditional on the "priorities developed by the Director." 25 U.S.C. § 3904(c). Because there is a predicate to imposing the duty to provide assistance, and because the Director of the Indian Health Service has discretion in doling out assistance, the Nation has not pled any "legally required" duty to act. *SUWA*,

542 U.S. at 63. As such, the dismissal of the Ninth Claim for Relief – like that of the Second Claim for Relief – was appropriate.

## F.  *Breach of Trust*

The final matter at issue in this case is the Tribe's breach-of-trust claim. With respect to all three sites, the Tribe alleged in its Tenth Claim for Relief that the Government breached various duties owed to it under federal common law, assorted statutes, and the 1850 Treaty between the Tribe and the United States. Navajo Compl. ¶¶ 121-26, *reprinted in* J.A. 171. The District Court dismissed the claim based in part on its conclusion that the sources of law relied upon by the Tribe did not create a cause of action. *El Paso III*, 774 F. Supp. 2d at 52-53. We hold, for the reasons discussed below, that the Tribe has failed to state a claim for relief because the Tribe has not identified a substantive source of law establishing *specific fiduciary duties*, a failure which is fatal to its trust claim regardless of whether we read the claim as brought under the APA or under a cause of action implied by the nature of the fiduciary relationship itself.

It helps to take a step back. Because the Government is a defendant here, the Tribe faces three threshold requirements to stating a viable claim for relief at the pleading stage: it must establish federal subject matter jurisdiction, a waiver of sovereign immunity, and a cause of action. *See Floyd v. District of Columbia*, 129 F.3d 152, 155 (D.C. Cir. 1997). The first of these is simple because the Tribe's claim turns on questions of federal law and, as such, the District Court properly enjoyed "arising under" jurisdiction pursuant to 28 U.S.C. § 1331. Nor is sovereign immunity in dispute. The Government has not argued that its immunity precludes the trust claim, Gov't Br. at 78-87, which comes as no surprise

since the second sentence of § 702 of the APA waives sovereign immunity not just for APA claims but also, more broadly, for claims "seeking relief other than money damages." 5 U.S.C. § 702; *see also Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("The APA's waiver of sovereign immunity applies to any suit whether under the APA or not."). The only threshold issue in dispute, then, is the third requirement: whether the Tribe has identified a viable cause of action and alleged facts sufficient to state a plausible claim under that cause of action.

The Tribe appears to argue that its claim can be maintained either (1) under the APA or (2) under a cause of action inferred from the fiduciary responsibilities undertaken by the Government. *See* Navajo Br. at 48, 49 n.9. On either conception of the claim our inquiry is largely the same because, under controlling precedent, a cause of action will be inferred from a fiduciary relationship only where a plaintiff can identify specific trust duties in a statute, regulation, or treaty. And this analysis overlaps with the APA's requirement that a plaintiff allege "that an agency failed to take a *discrete* agency action that it is *required to take*." *SUWA*, 542 U.S. at 64.

Before addressing the Tribe's specific arguments on appeal, we turn to the Supreme Court's case law concerning Indian trust claims, and then to the law of the circuit, to ascertain the principles that govern.

### 1. Governing Principles

The existence of a general trust relationship between the Government and Indian tribes is long established. *See, e.g.*, *Seminole Nation v. United States*, 316 U.S. 286, 296 (1942); *Cherokee Nation v. Georgia*, 30 U.S. 1, 17 (1831). But this

general trust relationship alone does not afford an Indian tribe with a cause of action against the Government, as the Nation acknowledges. Navajo Br. at 53. Something more is needed.

In decisions addressing Indian trust claims arising in the context of the Indian Tucker Act, 28 U.S.C. § 1505, the Supreme Court has inferred causes of action for money damages where statutes and regulations establish a conventional fiduciary relationship with the Government as trustee. We start with these decisions to see when statutes and regulations establish a conventional trust relationship and, as a result, imply a cause of action for breach of trust. Next, we turn to our own Indian trust law precedent, which confirms that we apply these same principles to trust claims brought under the APA.

### a.   Trust Claims under the Indian Tucker Act

The Supreme Court, in two pairs of cases, delineated what an Indian tribe must establish to bring a breach-of-trust claim for money damages against the Government under the Indian Tucker Act, 28 U.S.C. § 1505. *See United States v. Navajo Nation (Navajo I)*, 537 U.S. 488 (2003); *United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003); *United States v. Mitchell* (*Mitchell II*), 463 U.S. 206 (1983); *United States v. Mitchell* (*Mitchell I*), 445 U.S. 535 (1980).

*Mitchell I* and *Mitchell II* were decided in the same case, which was brought by members of the Quinault Tribe alleging that the Government mismanaged timber resources and thereby breached its duty as trustee. The posture of *Mitchell I* presented the question whether the Indian General Allotment Act of 1887 ("Allotment Act"), also known as the Dawes Act, authorized an award of money damages against the United States for its mismanagement of forests on land allotted under

the statute. 445 U.S. at 536. Section 5 of the Allotment Act provided that "the United States does and will hold the land thus allotted . . . in trust for the sole use and benefit of the Indian to whom such allotment shall have been made." *Id.* at 541 (quoting Allotment Act). But the Supreme Court concluded that this language created only a "limited trust relationship" that did not impose a judicially enforceable trust duty. *Id.* at 542. Rather than enacting particular governmental duties, the Court read the Allotment Act as entrusting the management of the land to the allottees themselves. *Id.* at 543. And the Court was persuaded that the "in trust" language was not intended to impose fiduciary duties on the United States, but to protect allottees from state taxation. *Id.* at 544. Although it rejected the trust claim predicated on the Allotment Act, the Court nevertheless allowed that *other* statutes could succeed where the Allotment Act failed. *Id.* at 546 & n.7.

*Mitchell II* considered these other statutes and held that they imposed enforceable fiduciary duties, *i.e.*, that they created a cause of action for breach of trust. The Court distinguished *Mitchell I*, stating that "[i]n contrast to the bare trust created by the General Allotment Act, the statutes and regulations [here] clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians. They thereby establish a fiduciary relationship and define the contours of the United States' fiduciary responsibilities." 463 U.S. at 224. The statutes at issue established "comprehensive" federal responsibilities to manage the harvesting of Indian timber and instructed that sales of Indian timber should be "based upon the Secretary's consideration of 'the needs and best interests of the Indian owner and his heirs.'" *Id.* at 222, 224 (quoting 25 U.S.C. § 406(a)).

Together, *Mitchell I* and *Mitchell II* make clear that neither the general trust relationship between the federal government and Indian Tribes nor the mere invocation of trust language in a statute (as in the Allotment Act) is sufficient to create a cause of action for breach of trust. As the Court later explained, "[a]lthough the undisputed existence of a general trust relationship between the United States and the Indian people can *reinforce* the conclusion that the relevant statute or regulation imposes fiduciary duties, that relationship alone is insufficient to support jurisdiction under the Indian Tucker Act. Instead, the analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Navajo I*, 537 U.S. at 506 (emphasis added) (alteration, internal quotation marks, and citation omitted).

In *Navajo I* and *White Mountain* – decided the same day – a divided Supreme Court further fleshed out these trust principles. In *Navajo I*, the Tribe asserted that the Secretary of the Interior committed a breach of trust by approving a sub-standard royalty rate in a coal lease on a tract of Indian land. 537 U.S. at 493. The Tribe argued that the Indian Mineral Leasing Act of 1938 assigned to the Secretary a fiduciary obligation to maximize returns from coal leases on Indian land whenever he exercised his statutory responsibility to approve mining leases. *Id.* at 496. The Court disagreed, notwithstanding that it was aware of the fact that the "Tribe's reservation lands . . . are held for it in trust by the United States." *Id.* at 495. Like the Allotment Act in *Mitchell I*, the Indian Mineral Leasing Act and associated regulations did not "assign to the Secretary managerial control over coal leasing." *Id.* at 508. In fact, the statute and regulations did not "even establish the 'limited trust relationship'" embodied under the Allotment Act. *Id.* (quoting *Mitchell I*, 445 U.S. at 542).

*White Mountain*, in contrast, allowed a trust claim to proceed. There the Tribe predicated its breach-of-trust claim on the "1960 Act," a paragraph-long statute that declared that a 400-acre parcel of land, which had been used as a military post and then as a school, was to be "held by the United States in trust for the White Mountain Apache Tribe, subject to the right of the Secretary of the Interior to use any part of the land and improvements for administrative or school purposes for as long as they are needed for [that] purpose." 537 U.S. at 469 (quoting Pub. L. No. 86-392, 74 Stat. 8 (1960)). The Secretary exercised his statutory right of use but allegedly failed to maintain the property, and the Tribe sued. The Court allowed the claim to proceed. Unlike the Allotment Act in *Mitchell I*, the 1960 Act, if sparsely worded, nevertheless went "beyond a bare trust" by investing the United States with "discretionary authority to make direct use of portions of the trust corpus." *Id.* at 474-75. Acknowledging that "the 1960 Act does not, like the statutes cited in [*Mitchell II*], expressly subject the Government to duties of management and conservation," the Court reasoned that "the fact that the property occupied by the United States is expressly subject to a trust supports a fair inference" of an obligation to preserve the trust property. *Id.* at 475.

Important to the Court's conclusion in *White Mountain* that the 1960 Act created a cause of action for money damages was the fact that the Act afforded the Secretary with a right of use and occupancy. Justices Ginsburg and Breyer, who joined the majority opinions in both *Navajo I* and *White Mountain* and who were the deciding votes in both cases, authored a concurrence in the latter explaining how the two opinions were "not inconsistent." *Id.* at 479 (Ginsburg, J., concurring). In the *White Mountain* concurrence, Justice Ginsburg explained that the "threshold set by the *Mitchell* cases is met" because the 1960 Act "expressly and without

qualification employs a term of art ('trust') commonly understood to entail certain fiduciary obligations . . . *and* 'invest[s] the United States with discretionary authority to make direct use of portions of the trust corpus.'" *Id.* at 480 (emphasis added) (quoting 537 U.S. at 475); *see also id.* ("The dispositive question . . . is whether the 1960 measure, in placing property in trust *and simultaneously providing for the Government-trustee's use and occupancy*, is fairly interpreted to mandate compensation for the harm caused by maladministration of the property." (emphasis added)).

Collectively, *Mitchell I*, *Mitchell II*, *White Mountain*, and *Navajo I* make clear that, while a cause of action for money damages under the Indian Tucker Act can be inferred as a concomitant to a specific fiduciary duty owed by the Government, a Tribe must first "identify *a substantive source of law* that establishes" that specific fiduciary duty. *Navajo I*, 537 U.S. at 506 (emphasis added). This "analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Id.* A statute's invocation of trust terminology is not itself dispositive, since the statute may create either a judicially enforceable trust as in *White Mountain* or a "bare trust," not judicially enforceable, as in *Mitchell I.* What separates a "bare trust" from a bona fide one is a matter of statutory interpretation, and the real question is whether the particular statute or regulation establishes rights and duties that characterize a conventional fiduciary relationship.

These principles control here, even though the claim is for equitable relief (not money damages) and even though sovereign immunity is waived under § 702 of the APA (and not the Indian Tucker Act). A bit of explanation is called for since this conclusion is not inevitable. We therefore turn to the law of the circuit.

### b. Circuit Precedent

The Indian Tucker Act confers jurisdiction to the Court of Federal Claims and waives sovereign immunity only for a limited subset of claims, namely those "arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or . . . [claims] which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe." 28 U.S.C. § 1505. Because of this limited language, facets of the Supreme Court's Indian Tucker Act jurisprudence may be unique to the Indian Tucker Act and, accordingly, not binding on Indian trust claims brought outside the Act. *See* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 5.05[3][c].

Although we appreciate this possibility, we nevertheless apply the lessons articulated in the *Mitchell* cases. We do so for two reasons: because this been our approach in past cases and, as important, because the Tribe has not marshaled an argument that we should reconsider our approach. We amplify both points below.

First, we have consistently relied on principles announced in Indian Tucker Act cases in trust cases not arising under the Act. We stated in *North Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980), that a "trust responsibility can only arise from a statute, treaty, or executive order; in this respect we are governed by [*Mitchell I*] holding that the United States bore no fiduciary responsibility to Native Americans under a statute which contained no specific provision in the terms of the statute." *Id.* at 611 (internal quotation marks and footnote omitted); *accord Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476, 1482 (D.C. Cir. 1995) ("[T]he government's fiduciary

responsibilities necessarily depend on the substantive laws creating those obligations." (citing the *Mitchell* cases)).

Our decision in *Cobell VI*, upon which the Tribe relies, is not to the contrary. *Cobell v. Norton* (*Cobell VI*), 240 F.3d 1081 (D.C. Cir. 2001). It is true that there we quoted *Mitchell II* to say that a "'fiduciary relationship necessarily arises when the Government assumes such elaborate control over forests and property belonging to Indians. All of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds).'" *Id.* at 1098 (quoting 463 U.S. at 225). However, we said this not to suggest that an actionable fiduciary relationship arises merely by operation of federal common law. Rather, we explained that the common law informs the interpretation of statutes that establish the elements of a common-law trust without employing the terms of art. The *Mitchell II* rule, we said, "operates as a *presumption*," such that "'where the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) *even though nothing is said expressly in the authorizing or underlying statute* (or other fundamental document) about a trust fund, or a trust or fiduciary connection.'" *Id.* (emphasis added) (quoting 463 U.S. at 225). We then reiterated that a fiduciary relationship depends on *substantive* laws, stating that "the government's obligations are rooted in and outlined by the relevant statutes and treaties." *Id.* at 1099.

Second, the Tribe has not argued that the principles enunciated by the Supreme Court in the Indian Tucker Act cases do not control here. To be sure, it drops hints of disagreement in its brief – a footnote stating parenthetically

that some courts "fail to distinguish between" claims for money damages and those for equitable relief, Navajo Br. at 53 n.10, and a clause referring to the "even more rigorous jurisdictional requirements of the . . . Indian Tucker Act." Navajo Reply at 12; *see also* Navajo Br. at 16. But the Tribe never propounds a viable theory to contest the applicability of the established law of the circuit. Therefore, we are constrained to apply the standards articulated in the Indian Tucker Act cases to the trust claim before us.

## 2. The Tribe's Arguments

The Tribe argues that various statutes establish an enforceable fiduciary duty. We disagree.

### a. 25 U.S.C. § 640d-9(a)

The Tribe's primary contention on appeal is that, because the land in question is subject to an "express trust" under 25 U.S.C. § 640d-9(a), the Government uses the land subject to an enforceable fiduciary duty to manage and preserve the trust res, *i.e.*, the occupied tribal land. *See* Navajo Br. at 50 (citing *White Mountain*, 537 U.S. at 475). The Tribe's position reduces to a simple formula: an express trust plus actual governmental control equals enforceable trust duties.

This argument has surface-level appeal based on a loose congruence between the claims in *White Mountain* and here. Both involve allegations of governmental control over Indian property designated by statute as some sort of trust. And both statutes say precious little. Section 640d-9(a) provides that certain designated lands "shall be *held in trust by the United States exclusively for the Navajo Tribe* and as a part of the Navajo Reservation." 25 U.S.C. § 640d-9(a) (emphasis added). Meanwhile, the statute in *White Mountain* stated that

"all right, title, and interest of the United States in and to the lands, together with the improvements thereon, included in the former Fort Apache Military Reservation . . . are hereby declared to be *held by the United States in trust for the White Mountain Apache Tribe*, subject to the right of the Secretary of the Interior to use any part of the land and improvements for administrative or school purposes for as long as they are needed for that purpose." 74 Stat. at 8 (emphasis added).

But § 640d-9(a) differs in a crucial respect from the 1960 Act in *White Mountain*: It does not afford the government the right to use the land in question. This difference, far from inconsequential, leads to the conclusion that § 640d-9(a) is a "bare trust" in the realm of *Mitchell I*, *i.e.*, one that does not afford the Tribe with a cause of action. As noted above, the Supreme Court relied on the Government's express right of use in concluding that the 1960 Act created an enforceable cause of action for breach of trust. *See White Mountain*, 537 U.S. at 475; *id.* at 480 (Ginsburg, J., concurring). This makes sense: It is natural to infer that Congress intended that a correlative duty to maintain trust property would attach to an expressly provided right of use (if invoked). Unlike the 1960 Act, § 640d-9(a) offers no hook to find a correlative duty of management; the statute includes only the phrase "shall be held in trust." This is not enough, even if paired with allegations of governmental control at the Mill, the Dump, and the Highway 160 Site, because nothing in the pleadings or record suggest that the Government took control of the premises *pursuant* to § 640d-9(a).

Unable to infer specific fiduciary duties from § 640d-9(a), we conclude that the section does not create a cause of action for the Tribe. In reaching this conclusion, we do not, of course, suggest that an express right of governmental use is always necessary to find that a statute

affords a cause of action for breach of trust. However, governmental use may be relevant when a statutory reference to "trust" does not itself indicate whether Congress intended to establish specific fiduciary duties or a "bare trust" instead.

Our conclusion in this case is mandated by the Supreme Court's decision in *United States v. Navajo Nation* (*Navajo II*), 556 U.S. 287 (2009), which was not brought to our attention by the parties. On remand after *Navajo I* rejected a trust claim predicated on the Indian Mineral Leasing Act, the Federal Circuit relied on 25 U.S.C. § 640d-9(a) combined with allegations of control – the very argument pressed here – to conclude that the Tribe's claim was viable after all. *Navajo Nation v. United States*, 501 F.3d 1327, 1340-41 (Fed. Cir. 2007). The Federal Circuit reasoned that where "the government exercises actual control within its authority, neither Congress nor the agency needs to codify such actual control for a fiduciary trust relationship that is enforceable by money damages to arise." *Id.* at 1343 (citing *White Mountain*, 537 U.S. at 475).

The Supreme Court reversed. Although the Supreme Court did not specifically address 25 U.S.C. § 640d-9(a) in *Navajo II*, it rejected the Federal Circuit's reasoning wholesale: "*None of the sources of law cited by the Federal Circuit* and relied upon by the Tribe provides any more sound a basis for its breach-of-trust lawsuit against the Federal Government than those we analyzed in *Navajo I*. This case is at an end. The judgment of the Court of Appeals is reversed, and the case is remanded with instructions to affirm the Court of Federal Claims' dismissal of the Tribe's complaint." *Navajo II*, 556 U.S. at 302.

Simply put, *Navajo II* forecloses the Tribe's arguments that § 640d-9(a) plus the Government's control establishes an

actionable fiduciary relationship. The Court also makes clear that it reached its conclusion without regard to considerations unique to money damages. *See id.* ("Because the Tribe cannot identify a specific, applicable, trust-creating statute or regulation that the Government violated, we do not reach the question whether the trust duty was money mandating."). As the Court explained:

> *If* a plaintiff identifies such a [rights-creating or duty-imposing statutory or regulatory] prescription, and *if* that prescription bears the hallmarks of a "conventional fiduciary relationship," *White Mountain*, 537 U.S. at 473, *then* trust principles (including any such principles premised on "control") could play a role in "inferring that the trust obligation [is] enforceable by damages" . . . . But that must be the second step of the analysis, not (as the Federal Circuit made it) the starting point.

*Id.* at 301.

### b. The Indian Dump Cleanup Act, the Indian Agricultural Act, and the Mill Tailings Act

The Tribe next argues that the Indian Agricultural Act, the Indian Dump Cleanup Act, and the Mill Tailings Act also impose enforceable trust duties. Navajo Br. at 50. We need not tarry long over these claims.

The Mill Tailings Act does not purport to establish a conventional fiduciary relationship with an attendant cause of action for breach of trust. To begin with, as we observed in *El Paso II*, the Mill Tailings Act's "statement of purpose reveals that Congress passed the statute to protect public health *in general* rather than tribal health in particular." 632 F.3d at 1278 (emphasis added); *see also* 42 U.S.C. § 7901(b) (a

purpose is to "minimize or eliminate radiation health hazards *to the public*" (emphasis added)). Furthermore, unlike the statutory language in *Mitchell II*, which plainly created a conventional fiduciary relationship, *see* 463 U.S. at 224 (observing how a section of a 1910 act mandated that timber sales be based on "the needs and best interests" of the Indian owners), the language in the Mill Tailings Act manifests no similar "hallmarks of a conventional fiduciary relationship," *Navajo II*, 556 U.S. at 301 (internal quotation marks omitted). To the contrary, Congress took pains to insulate the Government from liability concerning the remediation, *see* 42 U.S.C. § 7915(a)(1), and from judicial review with respect to the Secretary of Energy's designation of sites, *see id.* § 7912(d). The legislative history reinforces our conclusion because it suggests that Congress did not intend to alter any trust duties, one way or the other. *See* H.R. REP. NO. 95-1480, pt. 2, at 39 (1978) ("The committee does not intend by this act to affect the responsibilities of the Secretary of the Interior as trustee for any Indian Tribe.").

Nor does the Indian Agricultural Act impose independently enforceable trust duties. Although the Act mentions the Government's "trust responsibility" in stating its findings and purposes, 25 U.S.C. §§ 3701, 3702, Congress was quite clear that "[n]othing in this chapter shall be construed to diminish *or expand* the trust responsibility of the United States toward Indian trust lands or natural resources, *or any legal obligation or remedy resulting therefrom*," *id.* § 3742 (emphasis added). To construe the Act as independently creating an enforceable trust responsibility would contravene the plain intent of Congress.

Any trust claim founded on the Indian Dump Cleanup Act fares no better. Granted, this statute, like the previous one, states in its findings that "the United States holds most

Indian lands in trust for the benefit of Indian tribes and Indian individuals." 25 U.S.C. § 3901(a)(5). But the statute does not vest in the Government – either expressly as in *Mitchell II* or by implication as in *White Mountain* – any responsibility for *management* or *control* of Indian property. To the contrary, the statute imposes a duty upon the Director of the Indian Health Service to assist tribal governments as *they* "carry out the activities necessary" to close open dumps. *Id.* § 3904(b). Because the statute contemplates management and control in the hands of tribal governments, the Indian Dump Cleanup Act falls comfortably within the ambit of *Mitchell I*.

To summarize: none of the cited sources of law – 25 U.S.C. § 640d-9(a), the Indian Agricultural Act, the Indian Dump Cleanup Act, and the Mill Tailings Act – create a conventional fiduciary relationship that is enforceable as a breach of trust either under the APA or as a separate cause of action implied from the nature of the trust relationship as provided by the *Mitchell* doctrine. We therefore have no occasion to determine the contours of the fiduciary duties owed by the Government. *See* Navajo Br. at 52 (arguing that the cited statutes "establish the contours of trust duties to be complemented with principles of general trust law").

### c.   Other Statutes

Finally, the Tribe argues that federal agencies, as a component of their fiduciary responsibilities, have a minimum duty to comply with generally applicable laws if their actions affect trust property. Navajo Br. at 52-54. This argument has no traction. The Tribe does not contend that, under the *Mitchell* doctrine, these generally applicable statutes afford it a cause of action for breach of trust, and for good reason. The generally applicable statutes – *e.g.*, RCRA and the Clean Water Act – do not establish a conventional fiduciary

relationship. Therefore, the Tribe's last argument is without merit.

### III. Conclusion

For the reasons stated above, we affirm the judgment of the District Court on all but two points. First, we reverse the dismissal "with prejudice" of Appellants' RCRA claims that relate to the Dump. We hereby remand with instructions to the District Court to enter judgment against Appellants "without prejudice." Second, we vacate the District Court's dismissal of Appellants' RCRA claims as to the Highway 160 Site and remand the case so that these claims can be considered on the merits.

*So ordered.*